**BECK–FORD CONSTRUCTION, LLC, et al., Plaintiffs,**

v.

**TCA GLOBAL CREDIT MASTER FUND, LP, et al., Defendants.**

**Case No. 1:15–cv–61706–UU**

United States District Court, S.D. Florida.

Signed 03/06/2017

Jordan Kam, Richard A. Roth, The Roth Law Firm, PLLC, New York, NY, Jeremy Robert Kreines, Paul Aiello, Miami, FL, for Plaintiffs.

Carl Francis Schoeppl, Jr., Schoeppl Law, P.A., Boca Raton, FL, Jacqueline Marie Arango, Miami, FL, Sandra Jessica Millor, Akerman LLP, Miami, FL, Lawrence Dean Silverman, Akerman LLC, Miami, FL, for Defendants.

## ORDER

Ursula Ungaro, UNITED STATES DISTRICT JUDGE

THIS CAUSE comes before the Court upon Defendants' Motion to Dismiss the Third Amended Complaint. D.E. 105.

THE COURT has considered the Motion, the pertinent portions of the record and is otherwise fully advised in the premises.

This case arises from a business relationship between Plaintiffs and Defendants in which Defendants loaned money to Plaintiffs pursuant to a series of agreements, and as consideration for such financing, Plaintiffs agreed to release and waive any potential claims against Defendants. There is no dispute that Plaintiffs received the benefits of the credit facilities provided by Defendants, and Plaintiffs do not seek to rescind the agreements relating to such credit facilities in this action. Rather, Plaintiffs are seeking damages mainly for Defendants' alleged misconduct that occurred prior to the execution of the final agreement.

However, Plaintiffs' Third Amended Complaint contains an overarching defect in that the exhibits to the Third Amended Complaint establish that Plaintiffs repeatedly waived and released their claims in return for receiving additional extensions of credit and other benefits. Plaintiffs cannot reap the benefits of the agreements and ignore the fact that as consideration for these agreements, Plaintiffs agreed to waive and release their claims against Defendants. Only Count Three in Plaintiffs'

Third Amended Complaint contains allegations pertaining to conduct that occurred subsequent to the signing of the final credit agreement; however, notwithstanding four attempts at pleading, this Court finds that Plaintiffs failed to state a plausible claim for breach of contract. For the reasons contained herein, this Court finds Plaintiffs' action is dismissed with prejudice.

### FACTUAL ALLEGATIONS

The following facts, conclusory and imprecise as they may be, are taken from Plaintiffs' Third Amended Complaint. D.E. 90.

### 1. Plaintiffs

Plaintiff, Bryan Scott Jarnagin ("Jarnagin"), is the Chief Executive Officer for each of the Plaintiff entities. *Id.* ¶ 3. Jarnagin is an entrepreneur who has experience in commercial construction, real estate development, and technology development. *Id.* ¶ 17. Over the past several years, Jarnagin has focused on creating businesses in the green technology industry. *Id.* ¶ 18. He controls each of the Plaintiff entities, either directly or indirectly. *Id.* ¶ 17. Jarnagin has a controlling interest in Plaintiff, LCTI Low Carbon Technologies International, Inc. ("LCTI"), which is a public company through which Jarnagin has sought to implement the business plan that is at issue in this case. *Id.* ¶ 19.

In 2013, LCTI owned or controlled assets with a total value of approximately $270 million dollars. *Id.* ¶ 20(a). This value included real estate that is controlled by LCTI through Plaintiff, WK Management Services ("WKMS"), and this property had an approximate fair market value of $88 million dollars. *Id.* In addition, LCTI's total value includes twenty-two (22) green technologies that are owned by LCTI, and this intellectual property had an appraised value of approximately $163 million dollars. *Id.* In 2013, the intellectual property was owned outright by LCTI without any encumbrance or lien. *Id.* ¶ 20(b). At that time, LCTI also controlled Plaintiff, Commercial & Institutional Mechanical, Ltd. ("C & I"), and was ready to acquire three other building contractors, including Plaintiff, Ideal National Mechanical Corporation ("Ideal"), with the aid of third-party financing. *Id.* ¶ 20(c). LCTI's assets are now encumbered by liens that secure TCA's loans. *Id.* ¶ 20(b).

In 2013, C & I was an energy efficiency firm that focused on large-scale institutional clients as well as energy efficiency projects that provided mechanical contracting services, such as pipefitting, welding, and sheet metal mechanic services. *Id.* ¶ 21. At that time, C & I had sufficient working capital to "generate millions of dollars of annual revenues and earn hundreds of thousands of dollars of annual net income before and after this business was acquired by LCTI in or about late 2011." *Id.* ¶ 21(a). C & I was controlled by Teposolar Technologies, Corp., which was controlled by Plaintiff, Sustainable Energy Properties, Inc. ("SEP"), which was controlled by LCTI. *Id.* ¶ 21(b). C & I is no longer operational. *Id.* ¶ 21(c).

In 2013, Plaintiff, WKMS, was a real estate holding company that owned real estate without any encumbrance or lien in Galveston County, Texas. *Id.* ¶ 22. WKMS was controlled by Project Green Lonestar Corp., which was controlled by SEP. *Id.* ¶ 22(a). The real estate is now encumbered by liens that secure TCA's loans. *Id.* ¶ 22(b).

In late 2014, LCTI's affiliate, Viridis Corporation, acquired Plaintiff, Beck–Ford Construction, LLC's ("Beckford"). At that time, Beckford was an established business with millions of dollars in assets, including cash in excess of $1 million dollars, and millions in annual revenues from which

Beckford earned annual net income in excess of $1 million dollars. *Id.* ¶ 107. Plaintiff, Viridis Corporation ("Viridis"), is a corporation organized under the laws of Nevada that was used by Jarnagin to acquired Beckford. *Id.* ¶ 7. *Id.* ¶ 125. Presently, Viridis owns sixty (60) percent of Beckford, and Jarnagin owns the other forty (40) percent. *Id.*

### 2. Defendants

Defendant, Robert Press ("Press"), is the Chief Executive Officer and Founding Partner of Defendant, TCA Global Credit Master Fund, LP ("TCA"). *Id.* ¶ 9. Defendant, Donna Silverman ("Silverman") is the Chief Operations Officer for TCA. *Id.* ¶¶ 10–11. In 2013, TCA was an offshore lender that Press and Silverman, through their positions as General Partner and the Investment Manager, used to entrap borrowers into predatory loans. *Id.* ¶ 23. Press and Silverman's objective was to extract unlawful interest and fees, and to seize collateral that over-secured said loans. *Id.* TCA raises capital by offering limited partnerships in TCA's "Master Fund" and various "feeder funds" to both United States and non-United States investors. *Id.* ¶ 24.

Since its inception, TCA has continuously raised capital from United States and non-United States investors. *Id.* ¶ 25. TCA raises capital by means of material misrepresentations to investors about TCA's manner of doing business. *Id.* TCA targets micro-cap and small-sized public companies with limited access to capital (*Id.* ¶ 27), targets borrowers who enjoy a receivable balance approximately twice the amount of the loan (*Id.* ¶ 28), and makes asset-based loans to such businesses because TCA requires "deal flow" from loans to sustain its liquidity. *Id.* ¶ 26. Over the years, a large portion of TCA's income has been derived from charging and collecting fees from its borrowers. *Id.* ¶ 28. When it administers loans, TCA also utilizes lock-box arrangements, which enable it to withhold from borrowers the cash flow due to be returned to them under the applicable loan documents. *Id.*

### 3. Press and Silverman's Roles in TCA

Press and Silverman use their roles in TCA to enrich themselves. *Id.* ¶ 30. Press is the director and owner of the General Partner of TCA, Defendant, TCA Global Credit Fund, GP, Ltd., Inc. ("TCA Global Credit Fund" or "General Partner"), which controls the business and affairs of TCA and has an ownership interest in TCA. *Id.* ¶ 30(a). Press and Silverman are the co-portfolio managers, and Press is the owner of the Investment Manager, that is, Defendant, TCA Fund Management Group Corp. ("TCA Fund Management" or "Investment Manager"). *Id.* ¶ 30(b). The Investment Manager has day-to-day responsibility for TCA. *Id.*

### 4. The Introduction of Jarnagin to Press and Silverman in 2013

In late summer 2013, Jarnagin was introduced to Press and Silverman. *Id.* ¶ 32. Prior to the introduction, Jarnagin represented to TCA's originators that he was looking to obtain a $10–million-dollar credit facility that would be used by LCTI to acquire three specific businesses: Ideal, Beckford, and ARC Abatement, Inc. ("ARC"). *Id.* ¶¶ 33, 35. When Jarnagin met Press and Silverman, Jarnagin repeated the amount and type of financing that was needed by LCTI to acquire the three specific operating businesses, the purchase of which Jarnagin had already negotiated. *Id.* ¶ 34.

### 5. Negotiation of the Credit Facility in 2013

From September through November 2013, Silverman and Press portrayed

themselves as lending officers who represented the General Partner and Investment Manager of TCA, and represented to Jarnagin that they were interested in a relationship with LCTI, after having reviewed its business plan. *Id.* Plaintiffs allege the following misrepresentations took place during this time period:

- **October 2013**: Press represented via telephone conversation that TCA was ready, willing, and able to provide the financing that Jarnagin was seeking because TCA wanted to "partner" with LCTI and foresaw a "long-term" relationship to provide the financing that LCTI needed to fulfill its business plan (*Id.* ¶ 36(a));

- **October 19, 2013**: Press and Silverman participated in a telephone conversation with Jarnagin in which they represented to Jarnagin that TCA was ready, willing, and able to commit and close on the financing that LCTI might need, including the $10–million-dollar credit facility that LCTI was seeking, a representation that was also repeated that same day via e-mail from Press and Silverman to Jarnagin. (*Id.* ¶ 36(b));

- **Before LCTI closed on the purchase of Ideal**: Silverman repeated the October 19, 2013 representation with more specifics via telephone conversation that after LCTI acquired Ideal with the credit facility, LCTI would be permitted to access additional financing from the same facility to acquire ARC and Beckford after closing on Ideal (*Id.* ¶ 36(c));

- Silverman represented via telephone conversation that she had reviewed the financial information for Ideal, ARC Abatement, and Beckford, she was a seasoned loan administrator who knew the construction business, and TCA had made similar loans and understood "cash flow" in the con-

struction industry, in general, and at Ideal, ARC, and Beckford, in particular. (*Id.* ¶ 36(d)); and

- Silverman represented via telephone conversation that TCA would assign a specific person who would become Jarnagin's principal contact at TCA while the loan was outstanding. The first advance was to be used to solely acquire Ideal and to pay TCA's fees. (*Id.* ¶ 36(e)).

Before closing, Silverman represented to Jarnigan that all revenues from C & I and Ideal would be deposited into a lockbox and then immediately transferred to C & I and Ideal minus the mandatory payments owed to TCA, and accounted for by TCA, so they would have funding to operate. *Id.* ¶ 37. Silverman represented to Jarnagin that TCA adheres to such procedures because of the importance of "cash flow" in the construction industry. *Id.* Jarnagin proceeded with closing on TCA's credit facility because the Borrowers believed they would be able to service and satisfy the debt, while making timely payments to their employees, subcontractors, and the suppliers of C & I and Ideal. *Id.* ¶ 38. Press and Silverman's representations to Jarnagin were made before closing of the credit facility from TCA and the purchase of Ideal. *Id.* ¶ 40.

6. **First Credit Agreement, Initial Advance and Purchase of Ideal in November 2013**

In or about November 2013, TCA's Florida counsel prepared loan documents for the credit facility in the amount of $10 million dollars. *Id.* ¶ 41. On November 19, 2013, the parties closed on the initial advance of the $10–million–dollar credit facility, and loan documents were executed, including the following:

- LCTI, C & I, SEP, and WKMS, as the "Borrowers," executed an Agree-

ment (the "First Credit Agreement") (*Id.* ¶ 42(a));

- The Borrowers executed a Revolving Note in the amount of $2,250,000 (the "Original Revolving Note for the First Credit Agreement") to evidence the initial advance on the $10–million-dollar credit facility (*Id.* ¶ 42(b));

- All of the initial advance under the First Credit Agreement was paid to either TCA or to the seller under LCTI's contract to purchase Ideal, which coincided with the closing of the First Credit Agreement; (*Id.* ¶ 42(c));

- The Borrowers executed security agreements that placed a first-priority security interest on their respective personal property, and the personal property of Ideal,[1] by virtue of Ideal becoming LCTI's subsidiary (*Id.* ¶ 42(e));

- WKMS also provided a Deed of Trust for its real estate in Texas (*Id.*); and

- The Borrowers executed a Lock Box Deposit Requirement Confirmation, requiring all receipts, monies, checks, notes, drafts, or other payments of any kind owing or payable to the Borrowers (and any subsidiary or affiliate, including Ideal) to be deposited into a TCA-controlled lockbox at Wells Fargo Bank, N.A., or mailed to a post office box in Atlanta, Georgia ("Lockbox") (*Id.* ¶ 42(f)).

The First Credit Agreement contained the following release language:

14.20 <u>Release</u>. In consideration of the mutual promises and covenant made herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, each Borrower hereby agrees to fully, finally and forever release and forever discharge and covenant not to sue Lender, and/or its parent companies, subsidiaries, affiliates, divisions, and their respective attorneys, officers, directors, agents, shareholders, members, employees, predecessors, successors, assigns, personal representatives, partners, heirs and executors from any and all debts, fees, attorneys' fees, liens, costs, expenses, damages, sums of money, accounts, bonds, bills, covenants, promises, judgments, charges, demands, claims, causes of action, suits, Proceedings, liabilities, expenses, obligations or contracts of any kind whatsoever, whether in law or in equity, whether under statute or otherwise, from the beginning of time through the Closing Date, including, without limiting the generality of the foregoing, any and all claims relating to or arising out of any financing transactions, credit facilities, debentures, security agreements, and other agreements including, without limitation, each of the Loan Documents, entered into by any Borrower with Lender and any and all claims that any Borrower does not know or suspect to exist, whether through ignorance, oversight, error, negligence, or otherwise, and which, if known, would materially affect their decision to enter into this Agreement or the related Loan Documents. The provisions of this Section shall survive the satisfaction and payment of the other Obligations and the termination of this Agreement.

D.E. 24–1 § 14.20 at p. 56. The Agreement also contained the following waiver provision:

---

1. Ideal was an established business that earned millions of dollars in revenue when it was acquired by LCTI. Like C & I, Ideal was a profitable business that earned annual net income in excess of $100,000. D.E. 90 ¶ 42(d).

5.3 <u>WAIVER OF DEFENSES.</u> EACH DEBTOR WAIVES EVERY PRESENT AND FUTURE DEFENSE, CAUSE OF ACTION, COUNTERCLAIM OR SETOFF WHICH SUCH DEBTOR MAY NOW HAVE OR HEREAFTER MAY HAVE TO ANY ACTION BY SECURED PARTY IN ENFORCING THE SECURITY AGREEMENT. PROVIDED SECURED PARTY ACTS IN GOOD FAITH, EACH DEBTOR RATIFIES AND CONFIRMS WHATEVER SECURED PARTY MAY DO PURSUANT TO THE TERMS OF THIS SECURITY AGREEMENT. THIS PROVISION IS A MATERIAL INDUCEMENT FOR SECURED PARTY GRANTED ANY FINANCIAL ACCOMMODATION TO DEBTORS.

D.E. 24–3 § 5.3 at p. 14.

The value of the collateral exceeded the total $10–million-dollar credit facility evidenced by the First Credit Agreement. D.E. 90 ¶ 43. Once TCA received a first-priority lien on the Borrowers' assets, the Borrowers were only able to obtain financing from another lender and only able to convey any liens in assets with the express consent of TCA. *Id.*

On or about November 19, 2013, Press and Silverman promised Jarnagin that funding for the next two anticipated acquisitions would follow as previously discussed. *Id.* ¶ 44. In early January 2014, Jarnagin submitted a request for another advance under the First Credit Agreement to allow LCTI to acquire ARC for $3.2 million dollars. *Id.* ¶ 45. TCA refused to fund the acquisition because Press wanted to wait. *Id.* ¶ 46. Jarnagin waited a few weeks, and then submitted another request for funding in the amount of $3.8 million dollars to acquire the third business, Beckford. *Id.* ¶ 47. Press and Silverman remained evasive and non-responsive

to Jarnagin's requests. *Id.* ¶ 48. After Jarnagin pressed for responses, Silverman finally stated in February 2014 that pursuant to TCA's "corporate charter," TCA could not and would not lend more than 2% of its assets under the First Credit Agreement, and therefore, both requests for additional financing were denied. *Id.* ¶ 49.

Jarnagin confronted Silverman, stating that TCA's inability to loan the Borrowers more than 2% of its assets contradicted the pre-contractual representations that were made by Press and Silverman in November 2013. *Id.* ¶ 51. In addition, it was at odds with the terms and conditions of the First Credit Agreement, which stated that TCA would consider making advances to the Borrowers up to a maximum amount of $10 million dollars. *Id.*

In February 2014, Jarnagin requested that TCA allow him to obtain financing from another lender so LCTI could complete the acquisitions, but TCA refused to consider Jarnagin's request. *Id.* ¶ 54. Jarnagin sought permission to use WKMS's real estate to secure financing elsewhere, yet TCA refused to consider this request as well. *Id.* LCTI was not able to acquire ARC because of TCA's refusal to consider the Borrowers' request for additional financing. *Id.* ¶ 56. LCTI was able to acquire Beckford ten months later; however, the previously-negotiated purchase price was increased by $900,000, and Jarnagin was forced to pay the price increase. *Id.* ¶ 57.

## 7. TCA's Misuse of the Lockbox to impair Cash Flow of C & I and Ideal

In January 2014, TCA failed to make a timely payment to C & I and Ideal of the difference between the total amount of revenues deposited into the Lockbox and the payments owed to TCA on a weekly

basis under the First Credit Agreement, otherwise known as the "Net Amount" under the language of the documents. *Id.* ¶ 58. The First Credit Agreement provided as follows: "The Lender agrees that the ... Net Amount will be transferred to Borrowers from the Lock Box Account via wire transfer or electronic funds transfer to an account designated by the Borrowers on the immediately subsequent Payment Date." *Id.* ¶ 59. Under the terms of the Agreement, the Net Amount should have been transferred to C & I and Ideal to be used for operating expenses, but it was withheld by TCA. *Id.* There was no explanation for the failure of TCA to transfer the Net Amount to the Borrowers on the required payment date. *Id.* ¶ 60.

Throughout 2014, TCA failed to timely transfer the Net Amount to C & I and Ideal on a number of occasions, but did not issue a default notice or explain to the Borrowers why the Net Amount was being withheld. *Id.* ¶ 61. The Borrowers understood that customers of C & I and Ideal deposited payments into the Lockbox account at Wells Fargo, which had a balance of over $1 million dollars at times due to TCA's failure to release the Net Amount. *Id.* ¶ 62. As a result, Ideal and C & I were unable to pay vendors' invoices for materials or services despite the fact that these companies, at all times, had sufficient revenues and cash flow to do so. *Id.* ¶ 67.

On numerous occasions, throughout 2014 and continuing into 2015, Jarnagin had separate conversations with both Press and Silverman, and Jarnagin disclosed to them that TCA was withholding the Net Amount from C & I and Ideal each month by not making a timely payment owed to these Plaintiffs. *Id.* ¶ 68. Defendants never offered a reasonable explanation as to why the money was not timely released. *Id.*

During the first half of 2014, Jarnagin objected to Silverman and Press that the failure of TCA to release the Net Amount on a timely basis, left C & I and Ideal in a weakened economic position as evidenced by the following:

- C & I and Ideal's employees, including construction workers, were resigning due to the nonpayment of wages, and general contractors or owners were supplementing the workforces of C & I and Ideal at the jobsites and reduced the profit paid to the Borrowers (*Id.* ¶ 69(a));

- C & I and Ideal were without sufficient funds to timely pay their suppliers, and vendors began to insist upon cash on delivery payment, which deprived the Borrowers of the credit lines that they previously had in the Texas construction industry (*Id.* ¶ 69(b)); and

- C & I and Ideal were without sufficient funds to pay their subcontractors, payroll taxes, and certain general contractors and owners began issuing joint checks to the subcontractors and C & I or Ideal, without making any provision in the joint checks for profit and overhead due to the Borrowers (*Id.* ¶ 69(c)).

8. **Circumstances Surrounding the Negotiation of the First Amendment**

Within a few months of signing the First Credit Agreement, C & I and Ideal were left without sufficient funds to pay their debts as they became due, and were at risk of losing construction contracts, including, without limitation, contracts with long-term customers. *Id.* ¶¶ 76, 78. On April 24, 2014, the balance under the First Credit Agreement was approximately $722,000. *Id.* ¶ 77. As a result of not having timely released the Net Amount to C & I and Ideal, the Lockbox contained over $1.5 million dollars. *Id.* Despite Jarnagin's objections to the misuse of the Lockbox,

Press and Silverman's only response was to offer the Borrowers another $1–million-dollar advance under the First Credit Agreement to be used as working capital. *Id.* ¶ 79.

### 9. First Amendment in May 2014

In May 2014, Jarnagin closed on the First Amendment to the First Credit Agreement to gain additional working capital. *Id.* ¶ 83. Prior to closing, Jarnagin was told by Silverman that if he did not accept the documents as they were drafted, then a default would be declared, no additional money would be returned to C & I or Ideal from the Lockbox, and TCA would force the Borrowers into foreclosure and bankruptcy and scuttle LCTI's business plan. *Id.* ¶ 84.

The First Replacement Revolving Note (the "First Replacement Note"), which was issued pursuant to the First Amendment was in the amount of $3,135,439.58, and was comprised of: (1) principal, accrued and unpaid interest, and other fees due under the Original Loan's Credit Agreement in the amount of $1,697,939.58; (ii) fees in the amount of $187,500, described as "additional consideration" under the First Amendment for the additional money being loaned; (iii) "certain amounts outstanding, due or owing as Advisory Fees under the Credit Agreement in the aggregate amount of $250,000" for TCA's return of LCTI's 2,500,000 shares of stock to LCTI; and (iv) an additional revolving loan contemplated by the First Amendment in the amount of $1 million dollars. *Id.* ¶ 85.

The First Amendment contained the following release provision, along with waiver language:

15. Release. As a material inducement for Lender to enter into this Amendment, each of the Borrowers does hereby release, waive, discharge, covenant not to sue, acquit, satisfy and forever discharges each of the Lender Indemnitees and their respective successors and assigns, from any and all liabilities, obligations, losses, damages, penalties, actions, judgments, Proceedings, suits, claims, costs, expenses and distributions of any kind or nature whatsoever in law or in equity which each Borrower ever had, now has, or which any successor or assign of each Borrower hereafter can, shall or may have against any of the Lender Indemnitees, for, upon or by reason of any matter, cause or thing whatsoever related to the Credit Agreement, the First Replacement Revolving Note, this Amendment or any other Loan Documents, through the date hereof. Each of the Borrowers further expressly agrees that the foregoing release and waiver agreement is intended to be as broad and inclusive as permitted by the laws governing the Credit Agreement. In addition to, and without limiting the generality of foregoing, each of the Borrowers further covenants with and warrants unto the Lender and each of the other Lender Indemnitees, that as of the date hereof, there exists no claims, counterclaims, defenses, objections, offsets or other claims against Lender or any other Lender Indemnitee, or the obligation of the Borrowers to comply with the terms and provisions of the Credit Agreement, this Amendment and all other Loan Documents. The foregoing release shall survive the termination of the Credit Agreement or any of the Loan Documents and repayment of the Obligations.

D.E. 24–5 § 15 at p. 5.

### 10. Interference with Refinancing from Another Lender in Summer 2014

In the summer of 2014, Jarnagin searched for refinancing from another lender to extinguish the Borrowers' rela-

tionship with TCA. D.E. 90 ¶ 87. In July 2014, Jarnagin received a term sheet from another Florida lender, Trade Finance Solutions ("TFS"), for a $6–million-dollar revolving line of credit, which would pay the indebtedness under the First Credit Agreement, and would cancel TCA's first-priority security interest in the Borrowers' collateral, while the remaining funds could be used by LCTI to acquire Beckford. *Id.* ¶ 88. Jarnagin informed TCA that the Borrowers intended to pay off the indebtedness owed to TCA by refinancing with TFS. *Id.* ¶ 89. Under the First Credit Agreement, the Borrowers had the right to pay off the outstanding balance at any time without penalty. *Id.* ¶ 90. However, TFS needed to communicate with TCA to complete its due diligence for the loan that TFS was prepared to make to the Borrowers. *Id.* ¶ 91. TCA was initially evasive and non-responsive to Jarnagin's requests that its representatives communicate with TFS, but Silverman eventually agreed to participate in a telephone call with TFS. *Id.* ¶ 92.

On September 2, 2014, Silverman, with the approval of Press, issued a default letter to Borrowers without prior notice, and represented to TFS, via telephone and electronic mail, that the Borrowers had failed to comply with their obligations concerning the Lockbox Account and their reporting duties. *Id.* ¶ 93. Silverman's letter further threatened the exercise of remedies in the event of a non-monetary default, unless the non-compliance was cured within ten (10) days. *Id.* However, a month prior to the issuance of the sham default notice, Press and Silverman had closed the Lockbox Account at Wells Fargo Bank, N.A. and had made it impossible for Plaintiffs to direct their customer deposits to that account. *Id.* Defendants did not provide Plaintiffs with new Lockbox information at Bank of America, N.A. until July 31, 2014, after which, C & I and Ideal agreed to use the new Lockbox as soon as they were able to do so. *Id.* In addition,

when TCA closed the lockbox account at Wells Fargo, TCA removed approximately $127,000 without any explanation or accounting. *Id.* ¶ 95.

Due to the issuance of the default letter, TFS refused to lend to Beckford, Ideal, and LCTI. *Id.* ¶ 99.

### 11. Circumstances Surrounding Second Amendment and Second Credit Agreement

After the First Amendment, TCA continued to misuse the Lockbox arrangement with the following consequences:

- **June 2014**: Due to the filing of claims and liens by subcontractors, Ideal was unable to timely pay Sure Tec Insurance Company, which cancelled the bonding line for Ideal and forced Ideal to make substitute arrangements with a surety who charged approximately $90,000 more than Sure Tec to issue the same type of bond on the Candence McShane Project Sterling High School (*Id.* ¶ 100(a));

- **Beginning in October 2014**: Once again, due to the filing of claims and liens by subcontractors, Ideal was unable to timely pay under its subcontract with the general contractor, Koontz Corporation, which was modified and $780,000 of the subcontract amount due to Ideal was deleted from the contract by change orders (*Id.* ¶ 100(b));

- **2014**: More general contractors began to insist upon supplementing the workforces of C & I and Ideal at numerous jobsites, including, without limitation, North Central, ISTC, Harvey Cleary, and Encino Trace (*Id.* ¶ 100(c));

- **Summer 2014**: Nearly all suppliers from whom C & I and Ideal ordered products from insisted upon cash on

delivery payment from these Borrowers (*Id.* ¶ 100(d)); and

- Other suppliers, including key suppliers who had worked with C & I and Ideal for years refused to quote prices to the Borrowers (*Id.* ¶ 100(e)).

Notwithstanding Jarnagin's objections, Defendants did nothing to address Jarnagin's difficulties. *Id.* ¶ 101. For example, in October 2014, Jarnagin traveled to Florida for a prearranged meeting with Press to discuss the damage that was being done to C & I and Ideal as a result of TCA's failure to release the Net Amount on a timely basis. *Id.* ¶ 102. Press refused to discuss the Lockbox account with Jarnagin, and told Jarnagin that if the Borrowers had any problem with TCA or the manner in which TCA was doing business, then Press would direct Silverman to issue a default notice, after which TCA would foreclose on the Borrowers' collateral and bankrupt Plaintiffs. *Id.* ¶ 103.

By October 2014, Defendants began to realize that there was little additional cash that TCA could strip away from C & I and Ideal. *Id.* ¶ 104. Thereafter, in October 2014, Silverman proposed that Jarnagin accept financing from TCA to acquire Beckford. *Id.* ¶ 105. Silverman promised that if Jarnagin could resurrect Beckford's acquisition, Press would authorize TCA to provide the acquisition financing for Beckford and an additional advance of $500,000 under the First Credit Agreement provided the Borrowers agreed to enter into a separate credit agreement with TCA and purchase Beckford through a Nevada corporation, which would then become a new borrower of TCA. *Id.* ¶ 106.

At the time of these discussions, Beckford was an established business with millions of dollars in current assets, including cash in excess of $1 million dollars, and millions of dollars in annual revenues from which Beckford earned annual net income

in excess of $1 million dollars. *Id.* ¶ 107. Jarnagin considered the proposal, believing that the acquisition of Beckford, together with the $500,000 advance under the First Credit Agreement, would permit LCTI to not only acquire another contractor but also to salvage Ideal. *Id.* Jarnagin eventually agreed to Defendants' demand that the borrower would be a Nevada entity. *Id.* Jarnagin changed the previous name of Cleantec Holdings to Viridis and agreed that he would purchase Beckford through Viridis. *Id.* ¶ 108.

### 12. Second Amendment in October 2014

In October 2014, Jarnagin closed on the Second Amendment to gain additional time to find a solution to his lending relationship with TCA. *Id.* ¶ 109. Prior to closing on the Second Amendment, Jarnagin was told by Silverman via telephone conversation in October 2014, that if Jarnagin did not accept the documents as drafted, then a default would be declared, no additional money from the Lockbox would be returned to C & I and Ideal, and TCA would obtain the Borrowers' assets via foreclosure or force Borrowers into bankruptcy. *Id.* ¶ 111.

On or about October 24, 2014, the Borrowers executed a Second Amendment to the First Credit Agreement and a Second Replacement Revolving Note (the "Second Replacement Note") in the amount of $3,768,563.04 to TCA, which amount was comprised of: (i) principal, accrued and unpaid interest, and other fees due under the First Credit Agreement as of October 24, 2014 in the $3,268,563.04; and (ii) an additional advance in the amount of $500,000. *Id.* ¶ 112.

The Second Amendment contained the following release provision, along with waiver language:

14. <u>Release.</u> As a material inducement for Lender to enter into this Amend-

ment, each of the Borrowers does hereby release, waive, discharge, covenant not to sue, acquit, satisfy and forever discharges each of the Lender Indemnitees and their respective successors and assigns, from any and all liabilities, obligations, losses, damages, penalties, actions, judgments, Proceedings, suits, claims, costs, expenses and distributions of any kind or nature whatsoever in law or in equity which each Borrower ever had, now has, or which any successor or assign of each Borrower hereafter can, shall or may have against any of the Lender Indemnitees, for, upon or by reason of any matter, cause or thing whatsoever related to the Credit Agreement, the First Replacement Revolving Note, this Amendment or any other Loan Documents, through the date hereof. Each of the Borrowers further expressly agrees that the foregoing release and waiver agreement is intended to be as broad and inclusive as permitted by the laws governing the Credit Agreement. In addition to, and without limiting the generality of foregoing, each of the Borrowers further covenants with and warrants unto the Lender and each of the other Lender Indemnitees, that as of the date hereof, there exists no claims, counterclaims, defenses, objections, offsets or other claims against Lender or any other Lender Indemnitee, or the obligation of the Borrowers to comply with the terms and provisions of the Credit Agreement, this Amendment and all other Loan Documents. The foregoing release shall survive the termination of the Credit Agreement or any of the Loan Documents and repayment of the Obligations.

D.E. 24–9 § 14 at p. 5.

### 13. Negotiation of Second Credit Agreement in 2014

In December 2014, Jarnagin expressed concerns to Silverman regarding the mak-

ing of another credit agreement with TCA. D.E. 90 ¶¶ 114–15. In response, Silverman represented to Jarnagin in a telephone conversation that she understood his concerns that TCA had not timely transferred the Net Amount due from the Lockbox to C & I and Ideal. *Id.* ¶ 115. Silverman represented via telephone conversation that TCA would timely transfer the full Net Amount to Beckford and Ideal. *Id.* Prior to the closing of the Second Credit Agreement, in December 2014, Silverman represented to Jarnagin in another telephone call that TCA would be willing to permit Beckford up to twelve (12) months to repay the amounts due and owed under the Second Credit Agreement. *Id.* ¶ 116.

### 14. Second Credit Agreement in December 2014

In December 2014, TCA's counsel prepared documents for a second credit facility. *Id.* ¶ 119. Despite the fact that the $500,000 advance evidenced by the Second Amendment and the anticipated advance of $4.1 million dollars under the Second Credit Agreement would have been within the amount of credit facility evidenced by the First Credit Agreement, the Defendants insisted on a separate credit agreement. *Id.* Shortly before closing, numerous documents were presented to Jarnagin, including a personal guaranty and a requirement that the Borrowers under the First Credit Agreement would accept liability for the performance of the obligations of the Borrowers under the Second Credit Agreement and the related loan documents. *Id.* ¶ 120.

On or about December 31, 2014, the parties closed on the second credit facility, pursuant to which an advance of $4.1 million dollars was made, and loan documents were then executed for the transaction. *Id.* ¶ 122. The loan documents that TCA required Viridis to execute included the fol-

lowing: (i) Senior Secured Revolving Credit Facility Agreement, (ii) Convertible Revolving Note in the amount of $4.1 million dollars, and (iii) Security Agreement. *Id.* ¶ 123. TCA required the following loan documents from the other Plaintiffs: (a) Beckford executed a Corporate Guaranty and Security Agreement, (b) Jarnagin executed a Personal Guaranty, Pledge and Escrow Agreement and Validity Certificate, and (c) LCTI, C & I, Ideal, SEP, and WKMS executed a Repayment Agreement. *Id.* ¶ 124. Pursuant to this Repayment Agreement, WKMS's Deed of Trust, which secured the Original Loan, as amended, now also secured the LCTI Repayment Agreement. *Id.* ¶ 124(c) n.7. In addition, LCTI was required to execute a Convertible Promissory Note to TCA (the "Fee Note") in the amount of $4.1 million dollars. *Id.* ¶ 124(d).

As a part of the Second Credit Agreement, in the Senior Secured Revolving Credit Facility Agreement, Plaintiffs, Viridis, Beckford, and Jarnagin agreed to the following release provision:

> 14.20 <u>Release.</u> In consideration of the mutual promises and covenants made herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, each Credit Party hereby agrees to fully, finally and forever release and forever discharge and covenant not to sue the Lender Indemnitees, and each one of them, from any and all debts, fees, attorneys' fees, liens, costs, expenses, damages, sums of money, accounts, bonds, bills, covenant, promises, judgments, charges, demands, claims, causes of action, Proceedings, suits, liabilities, expenses, obligations or contracts of any kind whatsoever, whether in law or in equity, whether asserted or unasserted, whether known or unknown, fixed or contingent, under statute or otherwise, from the beginning of time through the Effective Date, including any and all claims relating to or arising out of any financing transactions, credit facilities, notes, debentures, security agreements, and other agreements, including each of the Loan Documents, entered into by the Credit Parties with Lender and any and all claims that the Credit Parties do not know or suspect to exist, whether through ignorance, oversight, error, negligence, or otherwise, and which, if known, would materially affect their decision to enter into this Agreement or the related Loan Documents. The provisions of this Section shall survive the satisfaction and payment of the other Obligations and the termination of this Agreement.

D.E. 24–11 § 14.20. Additionally, as part of the Second Credit Agreement, Plaintiffs, LCTI, C & I, SEP, WKMS, and Ideal executed a Repayment Agreement, which included the following waiver clause:

> 11.4 <u>WAIVER OF DEFENSES.</u> THE CREDIT PARTIES WAIVE EVERY PRESENT AND FUTURE DEFENSE, CAUSE OF ACTION, COUNTERCLAIM OR SETOFF WHICH THE CREDIT PARTIES MAY HAVE AS OF THE DATE HEREOF TO ANY ACTION BY LENDER IN ENFORCING THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS. THE CREDIT PARTIES WAIVE ANY IMPLIED COVENANT OF GOOD FAITH AND RATIFIES AND CONFIRMS WHATEVER LENDER MAY DO PURSUANT TO THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AS OF THE DATE OF THIS AGREEMENT. THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER GRANTING ANY FINANCIAL ACCOMMODATION TO BORROWER.

D.E. 24–13 § 11.4. The parties also included the following release provision in the Repayment Agreement:

11.20 Release. In consideration of the mutual promises and covenants made herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, each Credit Party hereby agrees to fully, finally and forever release and forever discharge and covenant not to sue the Lender Indemnitees, and each one of them, from any and all debts, fees, attorneys' fees, liens, costs, expenses, damages, sums of money, accounts, bonds, bills, covenants, promises, judgments, charges, demands, claims, causes of action, Proceedings, suits, liabilities, expenses, obligations or contracts of any kind whatsoever, whether in law or in equity, whether asserted or unasserted, whether known or unknown, fixed or contingent, under statute or otherwise, from the beginning of time through the Effective Date, including any and all claims relating to or arising out of any financing transactions, credit facilities, notes, debentures, security agreements, and other agreements, including each of the Loan Documents, entered into by the Credit Parties with Lender and any and all claims that the Credit Parties do not know or suspect to exist, whether through ignorance, oversight, error, negligence, or otherwise, and which, if known, would materially affect their decision to enter into this Agreement or the related Loan Documents. The provisions of this Section shall survive the satisfaction and payment of the other Obligations and the termination of this Agreement.

*Id.* § 11.20.

All proceeds from the Second Credit Agreement, minus the fees deducted by TCA, were used to acquire Beckford, and TCA dictated that a controlling ownership interest in Beckford be acquired by Viridis, as a Nevada corporation. D.E. 90 ¶ 125. As a result of the closing, TCA obtained a first-priority lien on the Borrowers' and Beckford assets. *Id.* ¶ 128. TCA's first-lien position, together with the guarantees from Plaintiffs, diminished Plaintiffs' ability to obtain financing from any other lender because TCA would need to give its express consent. *Id.* Presently, Viridis owns sixty (60) percent of Beckford, and Jarnagin owns the other forty percent. *Id.* ¶ 125.

### 15. TCA's Misuse of Lockbox to Impair Beckford's Cash Flow

By February 2015, TCA, through Press and Silverman, reverted to withholding the Net Amount due to Beckford and Ideal from the Lockbox. *Id.* ¶ 129. There was no explanation offered for TCA's failure to transfer the Net Amount to Beckford on each succeeding Payment Date. *Id.* ¶ 130. No notice of a default was ever sent to Beckford. *Id.* ¶ 131.

In March 2015, when Jarnagin queried Defendants about their misuse of the Lockbox, Defendants began to ask for accelerated payments of the principal, despite Jarnagin's request for an extension of the maturity date in accordance with the terms of the Second Credit Agreement. *Id.* ¶ 132. Silverman and Press sent an e-mail to Jarnagin, stating that they would cause TCA to issue default notices, after which they would appoint bankers to take control of Plaintiffs' businesses if Jarnagin continued to question or object to Defendants' use of the Lockbox or TCA's request for increased payments so as to pay off the Second Credit Agreement on or before June 30, 2015. *Id.* ¶ 133. In March 2015, via e-mail, Press renewed the threats he made at the October 2014 meeting, advising Jarnagin that the Borrowers must do what TCA demanded because, as he told

Jarnagin in the prior year at the meeting in TCA's offices, "[t]his is not a discussion of equals" and "TCA is [as] serious as a tumor." *Id.* ¶ 135.

#### 16. Interference with Another Lender

Between 2014 and 2015, Jarnagin continued to seek refinancing. *Id.* ¶ 136. In April 2015, Jarnagin requested Silverman provide a payoff amount for the Second Credit Agreement in connection with a commitment letter received from a Texas lender. *Id.* ¶ 137. Under the Second Credit Agreement, Plaintiffs had the right to pay off the outstanding balance under the Second Credit Agreement without penalty, as of April 1, 2015. *Id.* ¶ 138. Immediately following Jarnagin's request for the payoff statement, Silverman informed Jarnagin of an alleged default under the Second Agreement. *Id.* ¶ 139.

In April 2015, Silverman informed Jarnagin via telephone conversation that Press had directed that TCA was prohibited from reinstating the Second Credit Agreement to a non-default status, unless Jarnagin signed an audit statement concerning the Fee Note. *Id.* ¶ 141. Jarnagin refused to sign the audit statement because there was no default, and the statement was materially false. *Id.* ¶ 142.

TCA issued a formal notice of default dated May 1, 2015, alleging Plaintiffs' failure to pay under the Repayment Agreement triggered the cross-default and cross-collateralization provisions of both the Second Credit Agreement and the Repayment Agreement. *Id.* ¶ 143. This notice of default broke off discussions with the other lender. *Id.* ¶ 144.

Defendants continued to make demands by which they sought to collect from Plaintiffs. *Id.* ¶ 145. For example, on August 12, 2015, Press and Silverman proposed a global amendment to the First Credit Agreement, as previously amended, the

Second Credit Agreement, and the related documents. *Id.* ¶ 146. The proposed Amendment to the Credit Agreements falsely stated certain aspects of the previous transactions and purported to release the collateral pledged in connection with the First Credit Agreement and Second Credit Agreement, so long as the Second Replacement Note in connection with the First Credit Agreement and the Note for the Second Credit Agreement were paid off within fifteen days and LCTI executed a promissory note in substantially the same form as the Fee Note. *Id.* ¶ 147. The proposed Amendment to Credit Agreements would have left Plaintiffs unable to obtain refinancing because the corporate and personal guaranties and asset pledges remained in force to secure the payment of the Replacement Fee Note. *Id.* The Third Amended Complaint is silent as to whether Plaintiffs executed the Amendment to the Credit Agreements.

#### 17. Lost Profits for C & I and Ideal

As a result of Defendants' conduct, C & I and Ideal have lost millions of dollars in profits, and LCTI's net worth has been diminished by millions of dollars. *Id.* ¶ 148. By misusing the Lockbox under the First Credit Agreement, TCA caused C & I and Ideal to become insolvent, which led to the resignation of employees and the outright termination of business dealings between the Borrowers and others, including contractors, bonding companies, suppliers and owners, or the alteration of dealings, such as:

- The demand for payment from these Borrowers for any supplies purchased on a Cash on Delivery basis (*Id.* ¶ 149(a));
- The payment to the Borrowers of amounts owed to them by general contractors or owners by means of joint checks accompanied by simulta-

neous lien waivers in all instances, including, for example, situations in which the Borrowers had billed *de minimis* amounts (i.e., less than $500) for supplies and services (*Id.* ¶ 149(b));

- The increase of retainage amounts for the work and materials provided by the Borrowers (*Id.* ¶ 149(c));
- The forced supplementation of the workforces of these Borrowers (*Id.* ¶ 149(d)); and
- The demand that Ideal accept change orders that reduced profits and overhead that Ideal would have otherwise earned (*Id.* ¶ 149(e)).

As a result of C & I and Ideal not having access to their cash in 2014, the Borrowers and their sureties were exposed to claims or lawsuits in 2015, leading to other adverse events, including the following judgments being entered:

- A judgment against C & I in April 2015 in the amount of $116,000 in the 164th Judicial District Court in Harris County, Texas in *Trane US, Inc. v. C & I*, Case Number 2014–60455;
- A judgment against Ideal in January 2015 in the amount of $18,300 in the County Court at Law # 1 of Harris County, Texas, in *Vicon Equipment Inc. v. Jarnagin*, Case Number 1058244;
- A judgment against Ideal in September 2015 in the amount of $39,000 in the County Court at Law # 3 of Bexar county, Texas, in *B.G. Metals, Inc. v. Ideal*, Case Number 2015–CV–02724;
- A judgment against C & I in September 2015 in the amount of $23,000 in the 334th Judicial District for Harris County, Texas, in *Building Specialties, Inc. v. C & I*, Case Number 2015–18666;

- A judgment against Ideal in September 2015 in the amount of $25,000 in the County Court at Law # 2 of Travis County, Texas, in *Labor Ready Central, Inc. v. Ideal*, Case Number C–1–CV–15–003359;
- A judgment against Ideal in October 2015 in the amount of $39,000 in the 193rd Judicial District Court in Dallas County, Texas, in *All–Tex Pipe and Supply Inc. v. Ideal*, Case Number DC–15–00248; and
- An award against Ideal in October 2015 in the amount of $200,000 in Harris County, Texas, in *Barlett Cocke General Contractors v. Ideal*, Case Number CPRG–15–48.

*Id.* ¶ 150(a)-(g).

In addition to causing C & I and Ideal to suffer the termination or the alteration of their business relationships and the entry of judgments or awards in the total approximate amount of $450,000, another result of the restrictions of cash flow to the Borrowers in 2014 was the loss of business and customers in 2015:

- **2010–2014:** C & I and Ideal enjoyed business from repeat customers in the amount of $30 million dollars and business from new customers in the amount of $21 million dollars, meaning on average, these Borrowers together had business in the amount of $10 million dollars annually (*Id.* ¶ 151(a));
- The business of the Borrowers began to materially decline in the second half of 2014. By 2015, C & I and Ideal had business in the approximate amount of only $1.5 million dollars (*Id.* ¶ 151(b)); and
- **Throughout 2014–2015:** C & I and Ideal made every effort to mitigate the damage that was being done to their profitability by TCA's miscon-

duct, submitting bids during this period in the total amount of $130 million dollars. Yet customers advised C & I and Ideal that even when they submitted the most competitive bids, contracts were awarded to others because of the appearance of insolvency due to Defendant's misuse of the Lockbox (*Id.* ¶ 151(c)). Overall, Ideal lost more than $25 million dollars in contracts in 2014–15, resulting in profits of approximately $6.2 million dollars. *Id.* ¶ 151(c) n.9.

As a result, C & I is no longer operational, and Ideal is winding down its business. *Id.* ¶ 152.

## 18. Diminishment of LCTI's Net Worth

Because of the loss of profits and goodwill by two of LCTI's legacy contractors, the business plan of LCTI has been derailed and its net worth, both currently and in the future, has been diminished. *Id.* ¶ 153. In addition, the values of the assets controlled by LCTI, either directly in the form of valuable green technologies, or indirectly through other Plaintiffs, including, for example, WKMS, which has title to real estate in the Bolivar Peninsular, has been substantially reduced by the first-priority lien of TCA, which secures debts supposedly in default, and which prevents Plaintiffs from using their assets to raise additional or substitute financing or from deploying the green technology on real estate that is now threatened by foreclosure proceedings in a jurisdiction that recognizes non-judicial foreclosure. *Id.* ¶ 154.

## PROCEDURAL HISTORY

On August 15, 2015, Plaintiffs, Viridis Corporation, Beck-ford Construction, LLC, LCTI Low Carbon Technologies International, Inc., Ideal National Mechanical Corporation, Commercial & Institutional Mechanical, Ltd., Sustainable Energy Properties, and Bryan Scott Jarnagin, filed their Complaint against Defendants, TCA Global Credit Master Fund, LP, Robert Press, and Donna Silverman. D.E. 1. In their Complaint, Plaintiffs alleged the following claims: (1) Violations of RICO under 18 U.S.C. § 1962(a); (2) Violations of RICO under 18 U.S.C. § 1962(c); (3) Violations of RICO under 18 U.S.C. § 1962(d); (4) Violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.211; (5) Declaratory Judgment; (6) Declaratory Judgment (LCTI Repayment Note Constitutes Usurious Interest under Florida law); (7) Tortious Interference with Business Relationships; (8) Civil Conspiracy; (9) Concert of Action; (10) Breach of Implied Covenant of Good Faith and Fair Dealing; (11) Unjust Enrichment; and (12) Accounting. *Id.*

On August 21, 2015, this Court ordered Plaintiffs to file a Civil RICO Statement pursuant to Southern District of Florida Local Rule 12.1. D.E. 7. Based upon the Court's review of Plaintiffs' Civil RICO Statement, the Court ordered Plaintiffs to file an Amended Complaint to incorporate the additional allegations that were included in the Case Statement and were not pleaded in the initial Complaint. D.E. 22.

On September 24, 2015, Plaintiffs filed their First Amended Complaint. D.E. 24. Plaintiffs alleged the following claims: (1) Violations of RICO under 18 U.S.C. § 1962(c); (2) Violations of RICO under 18 U.S.C. § 1962(d); (3) Violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.211; (4) Declaratory Judgment; (5) Declaratory Judgment (LCTI Repayment Note Constitutes Usurious Interest under Florida law); (6) Tortious Interference with Business Relationships; (7) Civil Conspiracy; (8) Concert of Action; (9) Breach of Implied Covenant of Good Faith and Fair Dealing; (10) Unjust Enrichment; and (11) Accounting. D.E. 24. Defendants then moved to dismiss each of

Plaintiffs' claims on the grounds that: (1) Plaintiffs released and waived any right to bring their action pursuant to the provisions included in the loan agreements that were entered into between Plaintiffs and TCA; and (2) Plaintiffs failed to state plausible claims. D.E. 33.

On December 17, 2015, this Court issued her Order on Defendants' Motion to Dismiss the First Amended Complaint, granting the Motion in part and denying the Motion in part. D.E. 68. The Court dismissed Plaintiffs' RICO claims without prejudice on the grounds that Plaintiffs failed to sufficiently plead that each Plaintiff had standing to bring the action. *Id.* Specifically, this Court found there were no allegations that Plaintiffs suffered any damages as a direct result of Defendants' conduct, which is required under the RICO standing analysis. *Id.* at 15. In addition, the Court found Plaintiffs failed to plead proximate cause and damages under RICO. *Id.* The Court ruled that Plaintiffs' RICO claims also failed because Plaintiffs failed to plead a proper enterprise, failed to plead mail/wire fraud with the requisite specificity required under Federal Rule of Civil Procedure 9(b), failed to sufficiently plead predicate acts, failed to plead a "pattern" or threat of "continued" criminal activity, and failed to state a civil conspiracy claim under the RICO statutes. *Id.* Based upon the foregoing, the Court ordered Plaintiffs to file their Second Amended Complaint to correct the deficiencies addressed in the Court's Order. *Id.*

On January 8, 2016, Plaintiffs, Viridis Corporation, Beck-ford Construction, LLC, LCTI Low Carbon Technologies International, Inc., Ideal National Mechanical Corporation, Commercial & Institutional Mechanical, Ltd., Sustainable Energy Properties, WK Management Services, and Bryan Scott Jarnagin filed their Second Amended Complaint against Defendants. D.E. 70. In their Second Amended

Complaint, Plaintiffs asserted the following claims: (1) Violations of RICO under 18 U.S.C. § 1962(c); (2) Violations of RICO under 18 U.S.C. § 1962(d); (3) Violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.211; (4) Declaratory Judgment; (5) Declaratory Judgment (LCTI Repayment Note Constitutes Usurious Interest under Florida law); (6) Tortious Interference with Business Relationships; (7) Civil Conspiracy; (8) Concert of Action; (9) Breach of Implied Covenant of Good Faith and Fair Dealing; and (10) Unjust Enrichment. D.E. 70. On January 20, 2016, Defendants moved to dismiss each of Plaintiffs' claims on the same grounds raised in their prior Motion to Dismiss. D.E. 74.

On March 11, 2016, this Court held a Scheduling Conference, at which point the Court informed the parties that she wished to hear oral argument on Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint. D.E. 86. On March 16, 2016, this Court heard oral argument on Defendants' Motion to Dismiss (D.E. 89) and subsequently granted Defendants' Motion (D.E. 88). In the Order granting Defendants' Motion, the Court ruled that Plaintiffs failed to coherently allege a plausible RICO violation in accordance with the pleading requirements set forth in *Twombly* and *Iqbal.* D.E. 88. In addition, the Court found Plaintiffs failed to plead the necessary factual allegations to establish RICO predicate acts of mail/wire fraud and the unlawful collection of debt and failed to articulate a pattern of racketeering activity that would comprise the RICO violations. *Id.* This Court also ruled that Plaintiffs failed to allege Defendants' corrupt intent, which is a required element to state a claim for the collection of an unlawful debt under Florida law, and failed to allege any direct injuries from the RICO violations. *Id.* The Court ordered Defendants to file their Third Amended

Complaint. *Id.* In her Order, the Court expressly stated that "[n]o further amendments will be permitted or considered." *Id.*

On March 31, 2016, Plaintiffs, Beck-ford Construction, LLC, Commercial & Institutional Mechanical, Ltd., LCTI Low Carbon Technologies International, Inc., Ideal National Mechanical Corporation, Bryan Scott Jarnagin, Sustainable Energy Properties, Viridis Corporation, and WK Management Services, Inc., filed their Third Amended Complaint against Defendants, Robert Press, Donna Silverman, TCA Global Credit Master Fund, TCA Fund Management Group Corp., Trafalgar Capital Advisors, Inc., and TCA Global Credit Fund, LP, Ltd., Inc. D.E. 90. In their Third Amended Complaint, Plaintiffs assert the following claims: (1) Breach and Bad Faith under First Credit Agreement against TCA; (2) Fraudulent Misrepresentation against all Defendants; (3) Breach and Bad Faith under Second Credit Agreement against TCA; (4) Fraudulent Misrepresentation against all Defendants; (5) Tortious Interference against all Defendants; (6) Damages for Florida Usury Law Violations against TCA; (7) Declaratory Relief for Florida Usury Law Violations against TCA; (8) Violation of Florida Deceptive and Unfair Trade Practices Act against all Defendants; (9) Damages from Civil Conspiracy against all Defendants; (10) Violation of RICO under 18 U.S.C. § 1962(c) against Robert Press, Donna Silverman, TCA Global Credit Fund, GP, Ltd., Inc., and TCA Fund Management Group Corp.; and (11) Violation of 18 U.S.C. § 1962(d) against Robert Press, Donna Silverman, TCA Global Credit Fund, GP, Ltd., Inc., and TCA Fund Management Group Corp. D.E. 90. Defendants subsequently moved to dismiss each of Plaintiffs' claims.

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) provides that a plaintiff's pleading "must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has stated that a plaintiff must submit "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

In considering a motion to dismiss for failure to state a cause of action, the "plausibility standard is met only where the facts alleged enable 'the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 708 (11th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937)). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955)). Although "[a] plaintiff need not plead 'detailed factual allegations[,] ... a formulaic recitation of the elements of a cause of action will not do,'" and the plaintiff must offer in support of its claim "sufficient factual matter, accepted as true, to 'raise a right to relief above the speculative level.'" *Simpson*, 744 F.3d at 708 (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955)).

## ANALYSIS

In their Motion to Dismiss, Defendants argue that each of Plaintiffs' claims fails and should be dismissed with prejudice. Specifically, Defendants argue: (1) Plaintiffs' claims fail as a matter of law because

Plaintiffs cannot plead around the waivers, release, and ratification provisions contained within the loan documents; and (2) Plaintiffs' RICO claims fail because Plaintiffs' alleged predicate acts are not actionable, Plaintiffs failed to plead proximate cause and damages, there is no RICO pattern or a threat of continued criminal activity, and because the underlying RICO claim fails, Plaintiffs' RICO civil conspiracy claim also fails.

This Court finds Plaintiffs' action must be dismissed with prejudice. In the agreements appended to Plaintiffs' Third Amended Complaint, it is clear that Plaintiffs effectively waived and released Defendants from any and all claims that arose prior to the execution of each agreement. The only claim that pertains to Defendants' conduct subsequent to the signing of the final agreement is Count Three, where Plaintiffs allege a claim for Breach of Contract and Bad Faith under the Second Credit Agreement.[2] However, for the reasons stated herein, this Court finds Plaintiffs failed to state a plausible claim.

## I. PLAINTIFFS ARE BARRED BY THE WAIVER, RELEASE, AND RATIFICATION PROVISIONS CONTAINED WITHIN THE LOAN DOCUMENTS.

Defendants argue that all of Plaintiffs' claims are barred by the explicit terms of the loan documents, which contain releases, waivers, ratifications, affirmations, usury savings provisions, and representations in which Plaintiffs agreed that they were not relying on any representations predating the Loan Agreements, and that TCA maintained the sole and absolute discretion to increase the loan facility, approve acquisitions and remit the Net Amount to the borrowers, and that TCA behaved in good faith. Defendants also insist that Plaintiffs released and waived any protections afforded by usury statutes when they entered into the Loan Agreements. According to Defendants, based upon the language in the loan documents, Plaintiffs: (1) affirmed their obligations under the loan documents, (2) ratified the loan documents as being valid and binding, and (3) agreed they had no defenses to the enforcement of the loan documents and that TCA, as of the date of the amendments, had acted in good faith under the loan documents and had made no other promises or obligations to Plaintiffs other than what was included in the loan documents.

In response, Plaintiffs primarily focus on Defendants' arguments that they waived a usury claim or defense, arguing that Defendants have conflated the Florida law applicable to a "purge" agreement in a private contract under Section 687.04(2) and Florida law applicable to stipulations or agreements that settle ongoing litiga-

---

**2.** While the Court relied upon the parties' arguments in their briefings, this Court has also *sua sponte* scoured Plaintiffs' Third Amended Complaint to locate any and all allegations of Defendants' alleged misconduct, which occurred subsequent to the signing of the final agreement.

However, in doing so, the Court finds that ten of Plaintiffs' eleven claims solely include allegations of conduct that occurred prior to the final agreement's execution. These claims include: (1) Count One—Breach and Bad Faith under First Credit Agreement; (2) Count Two—Fraudulent Misrepresentation; (3) Count Four—Fraudulent Misrepresentation;

(4) Count Five—Tortious Interference; (5) Count Six—Florida Usury Law; (6) Count Seven—Florida Usury Law; (7) Count Eight—Florida Deceptive and Unfair Trade Practices Act; (8) Count Nine—Damages from Civil Conspiracy; (9) Count Ten—Violation of Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); and (10) Count Eleven—Violation of RICO, 18 U.S.C. § 1962(d). Plaintiffs' claim for Breach and Bad Faith under Second Credit Agreement in Count Three is the only claim that pertains to Defendants' alleged misconduct that occurred after the signing of the final agreement.

tion. Plaintiffs argue there was no valid "purge" agreement under Section 687.04(2), which would preclude their usury claims. Plaintiffs also argue that the releases do not bar inchoate claims, meaning claims that had not yet arisen, and even if the intent was to bar future wrongdoing, Florida law does not recognize an exculpatory clause that would bar claims for intentional torts, bad faith, or a breach of contract claim that arise after an agreement is executed. Plaintiffs also complain that while the First Amendment and Second Amendment contain ratification or estoppel clauses in which the Borrowers purport to ratify TCA's conduct under the First Credit Agreement and acknowledge the lender's purported "good faith," the difference between the Agreements is that the former were coerced by economic compulsion.

 In this case, there were four agreements that were negotiated and executed between the parties: the First Credit Agreement, dated July 31, 2013, the First Amendment to the First Credit Agreement, dated May 20, 2014, the Second Amendment to the First Credit Agreement, dated October 24, 2014, and the Second Credit Agreement, dated October 31, 2014. Each agreement contains release, waiver, and ratification provisions. However, this Court need not delve into the clauses in all of the agreements since the Second Credit Agreement, as well as the related Repayment Agreement, contains provisions pursuant to which Plaintiffs purport to waive and release and any and all claims and damages of the type asserted in the Third Amended Complaint.

As a part of the Second Credit Agreement, in the Senior Secured Revolving Credit Facility Agreement, Plaintiffs, Viridis, Beckford, and Jarnagin agreed to the following release provision:

14.20 Release. In consideration of the mutual promises and covenants made herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, each Credit Party hereby agrees to fully, finally and forever release and forever discharge and covenant not to sue the Lender Indemnitees, and each one of them, from any and all debts, fees, attorneys' fees, liens, costs, expenses, damages, sums of money, accounts, bonds, bills, covenant, promises, judgments, charges, demands, claims, causes of action, Proceedings, suits, liabilities, expenses, obligations or contracts of any kind whatsoever, whether in law or in equity, whether asserted or unasserted, whether known or unknown, fixed or contingent, under statute or otherwise, from the beginning of time through the Effective Date, including any and all claims relating to or arising out of any financing transactions, credit facilities, notes, debentures, security agreements, and other agreements, including each of the Loan Documents, entered into by the Credit Parties with Lender and any and all claims that the Credit Parties do not know or suspect to exist, whether through ignorance, oversight, error, negligence, or otherwise, and which, if known, would materially affect their decision to enter into this Agreement or the related Loan Documents. The provisions of this Section shall survive the satisfaction and payment of the other Obligations and the termination of this Agreement.

D.E. 24–11 § 14.20. Additionally, as part of the Second Credit Agreement, Plaintiffs, LCTI, C & I, SEP, WKMS, and Ideal executed a Repayment Agreement, which included the following waiver clause:

11.4 WAIVER OF DEFENSES. THE CREDIT PARTIES WAIVE EVERY PRESENT AND FUTURE DEFENSE, CAUSE OF ACTION, COUN-

TERCLAIM OR SETOFF WHICH THE CREDIT PARTIES MAY HAVE AS OF THE DATE HEREOF TO ANY ACTION BY LENDER IN ENFORCING THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS. THE CREDIT PARTIES WAIVE ANY IMPLIED COVENANT OF GOOD FAITH AND RATIFIES AND CONFIRMS WHATEVER LENDER MAY DO PURSUANT TO THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AS OF THE DATE OF THIS AGREEMENT. THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER GRANTING ANY FINANCIAL ACCOMMODATION TO BORROWER.

D.E. 24–13 § 11.4. The parties also included the following release provision in the Repayment Agreement:

11.20 Release. In consideration of the mutual promises and covenants made herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, each Credit Party hereby agrees to fully, finally and forever release and forever discharge and covenant not to sue the Lender Indemnitees, and each one of them, from any and all debts, fees, attorneys' fees, liens, costs, expenses, damages, sums of money, accounts, bonds, bills, covenants, promises, judgments, charges, demands, claims, causes of action, Proceedings, suits, liabilities, expenses, obligations or contracts of any kind whatsoever, whether in law or in equity, whether asserted or unasserted, whether known or unknown, fixed or contingent, under statute or otherwise, from the beginning of time through the Effective Date, including any and all claims relating to or arising out of any financing transactions, credit facilities, notes, debentures, security agreements, and other agreements, including each of the Loan Documents, entered into by the Credit Parties with Lender and any and all claims that the Credit Parties do not know or suspect to exist, whether through ignorance, oversight, error, negligence, or otherwise, and which, if known, would materially affect their decision to enter into this Agreement or the related Loan Documents. The provisions of this Section shall survive the satisfaction and payment of the other Obligations and the termination of this Agreement.

*Id.* § 11.20.

 Under both Nevada and Florida law,[3] the Court finds that the broad re-

---

3. In each of the documents at issue in this case, the parties included a choice-of-law provision which provides that the agreements should be construed in accordance with and governed by Nevada laws. *See* D.E. 24–1 at § 14.11, p. 54; *see also* D.E. 24–2 at ¶ 4, p. 2; D.E. 24–3 at § 5.8, p. 15–16; D.E. 24–6 at ¶ 4; D.E. 24–10 at ¶ 5, p. 2; D.E. 24–11 at § 11.12; D.E. 24–11 at § 9.14; D.E. 24–11 at § 16(h); D.E. 24–11 at § 5.8; D.E. 24–11 at § 10; D.E. 24–12 at ¶ 4, p. 2; D.E. 24–13 at § 11.12, p. 35; D.E. 24–13 at § 9.14, p. 10; D.E. 24–13 at § 5(d), p.5; D.E. 24–13 at § 7, p. 4; D.E. 24–13 at § 5.8, p. 15; D.E. 24–13 at § 5.8, p. 16; D.E. 24–13 at § 7, p. 4. Notwithstanding these choice-of-law provisions, Plaintiffs make a conclusory argument that this Court should apply Florida law because Nevada law bears no relation to the transactions at issue. "A choice of law provision in a contract 'is presumed valid until it is proved invalid; the party who seeks to prove such a provision invalid bears the burden of proof.'" *L'Arbalete, Inc. v. Zaczac,* 474 F.Supp.2d 1314 (S.D. Fla. 2007) (citing *Acosta v. Campbell,* 2006 WL 146208 (M.D. Fla. Jan. 18, 2006)); *Delhomme Indus., Inc. v. Houston Beechcraft, Inc.,* 669 F.2d 1049, 1058 (5th Cir. 1982). While the Court finds Plaintiffs failed to meet their burden in demonstrating that these choice-of-law provisions are invalid, the Court finds that the result remains the same under both Nevada and Florida laws.

lease and waiver provisions bar all of Plaintiffs' claims that contain allegations of Defendants' misconduct, which occurred prior to the execution of the Second Credit Agreement. Under Nevada law, contracting parties may waive defenses and release claims in a bargained-for-exchange. *See Shull v. Vestin Realty Mortg. I, Inc.*, No. 69068, 2014 WL 549548, at *1 (Nev. 2014) (enforcing a waiver of defenses contained in underlying guaranty agreement); *Pepe v. Eighth Judicial Dist. Court of ex rel. Cty. of Clark*, No. 51239, 124 Nev. 1499, 2008 WL 6058802, at *2 (Nev. 2008) (holding that a release that contains clear and unambiguous language is enforceable); *Clark v. Columbia/HCA Info. Servs., Inc.*, 117 Nev. 468, 480–481, 25 P.3d 215 (Nev. 2001) (finding a release can bar future causes of action if expressly contracted for by the parties). In addition, under Florida law, clear and unambiguous release provisions are enforceable. *Brewer v. Laborfinders of Tampa*, 944 So.2d 1102, 1103 (Fla. 1st DCA 2006) (finding release is enforceable); *see also Plumpton v. Continental Acreage Dev. Co., Inc.*, 830 So.2d 208 (Fla. 5th DCA 2002) ("Where the language of the release is clear and unambiguous, we cannot indulge in construction or interpretation of its plain meaning."); *Hold v. Manzini*, 736 So.2d 138, 141 (Fla. 3d DCA 1999) ("Under Florida law, a general release 'will ordinarily be regarding as embracing all claims or demands which had matured at the time of its execution.' "). "A release is a contract itself, and principles of law applicable to contracts generally are also applicable to releases." *Allgood Elec. Co. v. Martin K. Eby Constr. Co., Inc.*, 85 F.3d 1547, 1552 (11th Cir. 1996). In Florida, it is well-established law that "the execution of a valid release results in the termination of all rights covered by the agreement." *Hall v. Burger King Corp.*, 912 F.Supp. 1509, 1520 (S.D. Fla. 1995) (citing *Pettinelli v. Danzig*, 722 F.2d 706, 708 (11th Cir. 1984) (release "conclusively

resolves all claims" covered by release); *Mulhern v. Rogers*, 636 F.Supp. 323, 325 (S.D. Fla. 1986)).

With the exception of Count Three, each claim in Plaintiffs' Third Amended Complaint pertains to Defendants' misconduct that occurred prior to the execution of the Second Credit Agreement. Therefore, because this Court finds the broad language of the waiver and release provisions bar claims containing any alleged misconduct by Defendants that occurred prior to the execution of the Second Credit Agreement, each of Plaintiffs' claims, with the exception of Count Three, must be dismissed with prejudice.

In their response, Plaintiffs expend a lot of energy in arguing that Defendants are not permitted to waive any usury defense under Florida law. However, that is simply not true. Under Florida law, any right to contest the validity of the underlying loan transaction, including any usurious terms, was effectively waived by Plaintiffs when they signed the four documents at issue in this case. "A release is a contract itself, and principles of law applicable to contracts generally are also applicable to releases." *Allgood Elec. Co. v. Martin K. Eby Constr. Co., Inc.*, 85 F.3d 1547, 1552 (11th Cir. 1996). In Florida, it is well-established law that "the execution of a valid release results in the termination of all rights covered by the agreement." *Hall v. Burger King Corp.*, 912 F.Supp. 1509, 1520 (S.D. Fla. 1995) (citing *Pettinelli v. Danzig*, 722 F.2d 706, 708 (11th Cir. 1984) (release "conclusively resolves all claims" covered by release); *Mulhern v. Rogers*, 636 F.Supp. 323, 325 (S.D. Fla. 1986)). In this case, each of the relevant documents clearly contains a release provision that effectively waives and releases Plaintiffs' usury claims.

Even assuming the underlying loan transaction contained usurious terms,

this fact, alone, does not make the loan transactions unenforceable. The Florida Supreme Court has stated, "usury is purely a personal defense created by statute for the protection of borrowers, and therefore, any borrower may waive his right to claim the benefit of such statute." *Gunn Plumbing, Inc. v. Dania Bank*, 252 So.2d 1, 4 (Fla. 1971). "Moreover, usury being a purely personal defense which may be availed of, or waived, at the election of the party aggrieved, it has no especial claims upon the indulgence and favor of the court, but must be disposed of upon the same principles and in the same manner as other defenses." *Id.* (citing *Mackey v. Thompson*, 153 Fla. 210, 14 So.2d 571 (1943)). "A stipulation properly entered into and relating to a matter upon which it is appropriate to stipulate is binding upon the parties and upon the Court. Also, a stipulation entered into during the course of one may action, unless expressly limited by its terms, be recognized in another action or proceeding." *Id.* "The usury statute in [Florida] does not have the effect of invalidating contracts for interest at a rate higher than the statutory maximum, but only accords to the obligor the privilege of setting up, or waiving, affirmative defenses of usury in respect to such contracts." *Id.* (citing *Yaffee v. Internat'l Co., Inc.*, 80 So.2d 910, 912 (Fla. 1955)). Thus, assuming any of the transactions were usurious under Florida law, Plaintiffs were capable of waiving such defense in the loan documents, which they effectively did when they agreed to include the language in the waiver provisions addressed above.

Plaintiffs' argument that Defendants "misstate Florida usury law" and their attempt to distinguish *Park Ave. Inv. & Dev., Inc. v. Barkheimer*, 471 U.S. 1108, 105 S.Ct. 2171, 85 L.Ed.2d 859 (1985), *Gunn Plumbing*, and *In re Dawkins*, 546 B.R. 463 (Bankr. M.D. Fla. 2016) from the facts of this case is misplaced. The cases cited by Defendants stand for the proposition that usury is a personal defense that may be waived by a party. Contrary to Plaintiffs' position, none of the courts in these cases focused on the stage at which the waiver was signed; rather, the courts only focused on the fact that the waiver was knowingly and voluntarily signed and executed. Although Plaintiffs may now have buyers' remorse in signing these documents, the Court's finding that Plaintiffs waived their usury claims does not run afoul of public policy as waiver is permissible under Florida law. *See Burroughs Corp. v. Suntogs of Miami, Inc.*, 472 So.2d 1166, 1167 (Fla. 1985) ("Florida's usury statute prohibiting certain interest rates does not establish a strong public policy against two parties' contractually agreeing to apply another state's law, under which the agreement was valid."); *see also Morgan Walton Props., Inc. v. Int'l City Bank & Trust Co.*, 404 So.2d 1059, 1062 (Fla. 1981) ("The 'public policy' against usury ... was not so strong as to overcome the policy in favor of giving effect to the expressed intentions of contracting parties, even though as a factual matter the designation may indeed have been motivated by a desire to 'evade' Florida's usury law.").

The Court also rejects Plaintiffs' argument that the broadly-worded Releases in the Amendments are unenforceable due to economic compulsion. This argument is precisely why the Court has been frustrated with Plaintiffs throughout this case. First, this theory is unsupported in the Third Amended Complaint by facts, and therefore, has not been sufficiently pleaded. Second, throughout this case, Plaintiffs' theory of liability has not been that the Agreements and Amendments are unenforceable and should be rescinded; rather, Plaintiffs are seeking damages. This is due to the fact that Plaintiffs have received benefits under the Credit Agreements and Amendments. While it may be true that Defendants somehow breached their obli-

gations under the documents to obtain economic advantages and/or Defendants failed to fully perform under the terms, it is also undisputed that Plaintiffs received at least some financial benefits from Defendants. Under existing Eleventh Circuit precedent, the Court finds that Plaintiffs' economic coercion argument was waived when Plaintiffs pursued damages in this case, as opposed to rescission. *See Jackson v. Bell-South Telecomms.*, 372 F.3d 1250, 1279 (11th Cir. 2004) ("In order to proceed with claims that are plainly barred by the terms of the general releases, the plaintiffs would have to choose rescission ... [T]he prerequisite to rescission is placing the other party in status quo. In addition, a party's right to rescind is subject to waiver if he retains the benefits of a contract after discovering the grounds for rescission.") (internal citations omitted).

## II. PLAINTIFFS FAIL TO STATE A PLAUSIBLE CLAIM FOR BREACH OF CONTRACT UNDER THE SECOND CREDIT AGREEMENT.

Because this Court finds Plaintiffs have waived any and all claims arising from Defendants' conduct that occurred prior to the execution of the Second Credit Agreement, the only claim that remains for this Court's consideration is Count Three—Breach and Bad Faith under the Second Credit Agreement, which contains allegations pertaining to Defendants' conduct that occurred subsequent to the Second Credit Agreement's execution.

Three Plaintiffs—Beckford, LCTI, and WKMS—allege this Breach and Bad Faith claim under the Second Credit Agreement against TCA. D.E. 90 ¶¶ 203–216. Plaintiffs allege that the Second Credit Agreement required TCA to make payment each week of the Net Amount due and owed to Beckford under the second lockbox agreement and to provide an accounting for the lockbox, and TCA failed to do so in accordance

with the terms of the agreement. *Id.* ¶¶ 205–206. Plaintiffs further allege that as a result of TCA's conduct, Beckford was deprived of cash flow and working capital, and Beckford lost profits. *Id.* ¶¶ 209–210. In addition, Plaintiffs allege that LCTI's and WKMS's net worth was diminished because their assets were encumbered by the first-priority lien of TCA, and this lien prevented LCTI and WKMS from earning income from their intellectual property and real estate assets or from raising financing with which to earn income from these assets. *Id.* ¶¶ 211.

Defendants move to dismiss Count Three on the following two grounds: (1) LCTI and WKMS cannot allege this claim because the alleged breach only pertains to Beckford; and (2) the claim fails as to Beckford because it is expressly negated by the terms of the Second Credit Agreement. Specifically, Defendants argue that the terms of the Second Credit Agreement provided that: (1) TCA maintained the "sole and absolute" discretion to transfer the Net Amount from the lockbox to Beckford; (2) Beckford agreed that "[n]o condition, circumstance, event, agreement, document, instrument, restriction, litigation or Proceeding (or threatened litigation or Proceeding or basis thereof) exists which ... (ii) could adversely affect the ability of the Credit Parties to perform its obligations under the Loan Documents"; and (3) there are no allegations that Beckford satisfied the conditions precedent required in order for TCA to transfer the Net Amount, or that Beckford remained in good standing and no Event of Default had occurred under any Loan Document entitling it to the Net Amount.

In response, Plaintiffs failed to address Defendants' arguments that Plaintiffs did not allege actionable breaches. Instead, Plaintiffs focused on its allegations pertaining to Defendants' bad faith in failing

to transfer the Net Amount to Beckford. Plaintiffs appear to argue that notwithstanding the language in the Second Credit Agreement that TCA had the "sole and absolute" discretion to transfer the Net Amount to Beckford, TCA was not permitted to make arbitrary or capricious decisions. Thus, according to Plaintiffs, TCA violated its implied duty of good faith when it arbitrarily and capriciously refused to release the Net Amount of Beckford's revenues.

 To state a claim for a breach of contract, a party must allege: (1) a valid contract, (2) a material breach, and (3) damages resulting from that breach. See Friedman v. New York Life Ins. Co., 985 So.2d 56, 58 (Fla. 4th DCA 2008); Senter v. JPMorgan Chase Bank, N.A., 810 F.Supp.2d 1339, 1345 (S.D. Fla. 2011); see also Saini v. Int'l Game Tech., 434 F.Supp.2d 913, 919–20 (D. Nev. 2006); Brochu v. Foote Enters., Inc., 128 Nev. 884, 381 P.3d 596 (Nev. 2012). In addition, "a claim for breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law absent an allegation that an express term of the contract has been breached." Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc., 785 So.2d 1232, 1234 (Fla. 4th DCA 2001) (citing Burger King Corp. v. Weaver, 169 F.3d 1310, 1315 (11th Cir. 1999).

With respect to Defendants' argument that Plaintiffs LCTI and WKMS cannot bring the breach of contract claim against TCA, the Court agrees. The only breach alleged in Count Three is in paragraph 306, where Plaintiffs allege that TCA failed to pay the full Net Amount due and owed to Beckford on a timely basis and failed to provide an accounting in accordance with the terms and conditions of the Second Credit Agreement. D.E. 90 ¶ 206. There are no allegations whatsoever that TCA breached its obligations to LCTI and WKMS under the terms of the Second

Credit Agreement, and it follows that without a sufficiently alleged breach, a plaintiff cannot sustain damages. See Burger King Corp. v. Mason, 710 F.2d 1480, 1490 (11th Cir. 1983) ("[I]t is elementary that the mere breach of an agreement which causes no loss ... will not sustain a suit ... for damages, much less rescission."); see also Gustafson v. Schwarz, No. 2:13-cv-2197-RCJ-CWH, 2014 WL 4541419, at *4 (D. Nev. Sept. 9, 2014); Kerr v. Bank of Amer., N.A., No. 3:15-cv-00306-MMD-WGC, 2016 WL 54670, at *2 (D. Nev. Jan. 5, 2016). Accordingly, the Court will only analyze whether Plaintiff, Beckford, has alleged a plausible claim against TCA.

 Defendants argue that Beckford's claim for a breach under the Second Credit Agreement fails because Beckford's claims are negated by the terms of the loan documents. The Court agrees for two reasons.

First, under the terms of the agreement, TCA maintained the "sole and absolute" discretion to transfer the Net Amount of the lockbox to Beckford. The terms of the Second Credit Agreement explicitly provide that "notwithstanding anything contained in this Agreement or any other Loan Documents to the contrary, each Revolving Loan under this Agreement (including any Net Amount to be distributed hereunder) shall be subject to Lender's approval, which approval may be given or withheld in Lender's sole and absolute discretion." D.E. 24-11 § 2(2.1)(a) at 15. While Plaintiffs allege in a conclusory fashion that TCA acted in bad faith when it failed to give any explanation as to why TCA was withholding the Net Amount, it is clear that based upon the terms of the agreement, TCA maintained the "sole and absolute" discretion to distribute the Net Amount to Beckford. The Eleventh Circuit Court of Appeals has directed that when the appended exhibits govern when a con-

clusory allegation directly contradicts the terms of an agreement. *See Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1204 (11th Cir. 2007) ("Indeed, when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern.").

Second, even if the Second Credit Agreement did not provide TCA with the "sole and absolute discretion" to transfer the Net Amount, Beckford has failed to plead that it was entitled to the Net Amount from the lockbox. Section 2(2.1)(e)(i)(4)(ii) of the Second Credit Agreement provides that Beckford will receive the Net Amount only if six conditions precedent are met, Beckford remains in good standing, and no Event of Default had occurred under any loan document. However, notwithstanding that TCA maintained "sole and absolute" discretion to transfer the Net Amount, Beckford has failed to allege that it complied with the conditions precedent such that it should be entitled to the Net Amount. Under both Florida and Nevada law, courts have found a complaint fails to state a cause of action where the complaint contains no allegations concerning conditions precedent to performance of the contract. *See Hubbard v. Tebbetts*, 76 So.2d 280, 282 (Fla. 1954); *see also NGA # 2 Ltd. Liab. Co. v. Rains*, 113 Nev. 1151, 946 P.2d 163, 168 (1997). Thus, this Court cannot find that Plaintiffs have stated a plausible claim for a breach of the Second Credit Agreement.

## CONCLUSION

Despite three rounds of amendments, the Court finds that, once again, Plaintiffs have failed to state a claim in this case. Under different circumstances, the Court might be willing to provide Plaintiffs with yet another opportunity to state a plausible claim. However, this case has been pending for nearly two years. In addition, the Court has conducted oral argument on these issues, and has provided Plaintiffs with extensive guidance in her orders. The Court forewarned Plaintiffs that no further amendments would be given or considered after the filing of their Third Amended Complaint. D.E. 88. In light of this, the Court finds that dismissal with prejudice of Plaintiffs' Third Amended Complaint is warranted at this stage. Accordingly, it is hereby

ORDERED AND ADJUDGED that Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint (D.E. 105) is GRANTED. All pending claims against Defendants are DISMISSED WITH PREJUDICE. It is further

ORDERED AND ADJUDGED that all pending Motions are DENIED AS MOOT. This case is CLOSED for administrative purposes.

DONE AND ORDERED in Chambers at Miami, Florida, this 6th day of March, 2017.